******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* JAMAL SUMLER
## (AC 43024)

Prescott, Suarez and Bishop, Js.

*Syllabus*

Convicted, after a jury trial, of the crimes of murder, conspiracy to commit robbery in the first degree and carrying a pistol without a permit, and, after a trial to the court, of the crime of criminal possession of a pistol or revolver, the defendant appealed. The defendant's conviction stemmed from an incident in which he shot and killed a convenience store clerk while he and another individual were robbing the store. Prior to trial, the trial court denied the defendant's motion in limine to preclude the state from introducing testimony from his former probation officer, D, regarding her identification of him in a surveillance video taken from the store and in a still photograph from that video. This court affirmed the defendant's conviction, and the defendant filed a petition for certification to appeal to our Supreme Court, which granted the petition in part and vacated this court's judgment in part and remanded the case to this court to consider whether, under our Supreme Court's recent decision in *State* v. *Gore* (342 Conn. 129), the trial court abused its discretion by admitting D's testimony. The court in *Gore* articulated a new standard requiring courts to consider, under the totality of the circumstances, whether a witness was more likely than the jury to correctly identify the defendant from surveillance video or photographs, thereby meeting the requirements of the provision (§ 7-1) of the Connecticut Code of Evidence, and set forth four factors to be used in that consideration. *Held* that the trial court did not abuse its discretion by admitting D's testimony, as the four factors outlined in *Gore* weighed in favor of admitting D's testimony: under the first factor, which considers the witness' general familiarity with the defendant's appearance, D clearly had more than a minimal degree of familiarity with the defendant that enabled her to identify him more reliably than the jury based on the frequency, number and duration of their past contacts, the duration of their relationship and time since their last meeting, the relevant viewing conditions and the nature of their relationship; moreover, the second factor, which assesses the witness' familiarity with the defendant's appearance, weighed in favor of admitting D's testimony in light of her familiarity with his appearance at the time the video was taken and with a lanyard worn by the defendant in the video that resembled a similar lanyard that D had seen the defendant wear, the third factor, which assesses whether there had been a change in the defendant's appearance between the time the surveillance video or photographs were taken and trial, weighed in favor of admitting D's testimony because the defendant wore eyeglasses at trial but was not known to wear eyeglasses when the video was recorded and this change in the defendant's appearance put D in a better position to identify the defendant than the jury, which had only seen the defendant wearing eyeglasses, and, finally, the fourth factor, which addresses the quality of the video or photographs, as well as the extent to which the subject is depicted in the surveillance video or photograph, weighed in favor of admitting D's testimony because the video contained multiple views from inside and outside of the store, the defendant was not clearly, fully or solely depicted in either the video or photograph, the video and the photograph were neither unmistakably clear nor hopelessly obscure, and they fell in the range of quality that favors admissibility.

Argued October 25—officially released December 20, 2022

*Procedural History*

Substitute information charging the defendant with the crimes of felony murder, murder, conspiracy to commit robbery in the first degree, criminal possession of a pistol or revolver and carrying a pistol without a

permit, brought to the Superior Court in the judicial district of New Haven, where the court, *Vitale, J.*, granted the defendant's motion to sever the charge of criminal possession of a pistol or revolver; thereafter, the charges of felony murder, murder, conspiracy to commit robbery in the first degree and carrying a pistol without a permit were tried to the jury before *Vitale, J.*, and the charge of criminal possession of a pistol or revolver was tried to the court; verdict and judgment of guilty; subsequently, the court vacated the conviction of felony murder, and the defendant appealed to this court, *Prescott, Devlin* and *Bishop, Js.*, which affirmed the trial court's judgment; thereafter, the defendant, on the granting of certification, appealed to our Supreme Court, which vacated in part this court's judgment and remanded the case to this court for further proceedings. *Affirmed.*

*Naomi T. Fetterman*, with whom, on the brief, was *Peter G. Billings*, for the appellant (defendant).

*Laurie N. Feldman*, assistant state's attorney, with whom, on the brief, were *Patrick Griffin* and *John P. Doyle, Jr.*, state's attorneys, and *Lisa M. D'Angelo*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. This case returns to us on remand from our Supreme Court with direction to consider whether, in light of our Supreme Court's decisions in *State* v. *Bruny*, 342 Conn. 169, 269 A.3d 38 (2022), and *State* v. *Gore*, 342 Conn. 129, 269 A.3d 1 (2022), the trial court abused its discretion by admitting "testimony of the defendant's former probation officer identifying the defendant [Jamal Sumler] in a still photograph and video surveillance footage . . . ."[1] *State* v. *Sumler*, 345 Conn. 961, 961,      A.3d      (2022). Having considered the new rule governing the admissibility of opinion testimony identifying an individual in surveillance videos or photographs set forth in *Bruny* and *Gore*, we conclude that the trial court did not abuse its discretion by admitting testimony from the defendant's former probation officer with respect to the identity of the defendant in a still photograph and video surveillance footage.[2] Accordingly, we affirm the judgment of the trial court.

The following relevant facts, which were previously set forth in *State* v. *Sumler*, 199 Conn. App. 187, 235 A.3d 576 (2020), vacated in part, 345 Conn. 961,      A.3d      (2022), or reasonably found by the trial court, and procedural history are relevant to this claim. "On April 6, 2015, the defendant and two other individuals, Dwayne 'Hoodie' Sayles and Leighton Vanderberg, were travelling together in a green Ford Focus driven by Vanderberg. The defendant sat in the front passenger seat and was wearing sweatpants, a gray hoodie, and dark sneakers. . . .

"The three men drove to Eddy's Food Centre (Eddy's) located at 276 Howard Avenue in Bridgeport. Once they arrived, the defendant exited the car, while Vanderberg and Sayles remained inside. . . . [The defendant] went into Eddy's for a few minutes, returned to the car, and then went back into the store a second time. [An individual, later identified as the defendant, was captured on Eddy's surveillance video footage.] Upon his return to the car the second time, the defendant handed Sayles a pair of black gloves. He also retrieved his revolver and put it in the waistband of his sweatpants.

"Thereafter, the three men drove to the Fair Haven section of New Haven. Vanderberg pulled onto Kendall Street toward Fulton Terrace and parked the car, intending to smoke 'dutches'.[3] Not having enough cigars, someone suggested that they buy more cigars from a nearby store. The defendant and Sayles then exited the vehicle and walked up Fulton Terrace, with the defendant a few steps in front of Sayles, while Vanderberg remained in the car. The defendant entered the Pay Rite convenience store (Pay Rite) connected to a CITGO gas station located at 262 Forbes Avenue.

"Pay Rite surveillance videos captured the defendant,

wearing a black mask, black gloves, a gray hoodie, gray sweatpants, and dark sneakers, walk to the counter and point a gun at the clerk, Sanjay Patel, the victim in this case. While pointing the gun at the victim, the defendant walked behind the counter. The surveillance footage captured a second individual . . . later determined to be Sayles . . . entering the store and walking up to the counter. The victim struggled with the defendant and picked up a wooden stool. Sayles then pulled out a gun, aimed it at the victim, fired, and put the gun away in his hoodie pocket. The defendant, pointing his gun at the victim, used his other hand to pass items over the counter to Sayles, who put the items in his pocket before turning and leaving the store. As the defendant bent down to take . . . items, the victim hit him on his upper body with the stool. The defendant then shot the victim and ran out of the store. The victim subsequently died from his injuries." (Footnote omitted; footnote in original.) Id., 190–91.

"On April 17, 2015, detectives met with [Jayme] DeNardis, the defendant's previous probation officer. DeNardis viewed a still photograph from video surveillance footage captured from Eddy's on April 6, 2015. She signed the photograph and identified the defendant as the individual in the footage and as being one of her probationers. The defendant filed a motion in limine to preclude DeNardis from testifying at trial about the identity of the individual captured on surveillance video footage from Eddy's.[4] He claimed that her identification of him in the video [and the photograph] would, pursuant to [*State* v. *Finan*, 275 Conn. 60, 881 A.2d 187 (2005), overruled by *State* v. *Gore*, 342 Conn. 129, 269 A.3d 1 (2022)], constitute improper testimony as to 'the ultimate issue in question: identity.'

"A hearing was held on October 26, 2017, during which the state presented DeNardis [as a witness] . . . . The defendant reiterated his objection to the admission of DeNardis' proffered testimony on the basis that it constitutes her opinion about the ultimate issue of fact—whether he was the individual on the surveillance video committing the crimes with which he was charged—which is prohibited under *Finan*.

"The court denied the defendant's motion in limine, concluding that the proffered evidence is not 'tantamount to a legal opinion about the defendant's criminal culpability.' "[5] (Footnote added; footnotes omitted.) *State* v. *Sumler*, supra, 199 Conn. App. 200. In denying the defendant's motion in limine, the court made several factual determinations regarding DeNardis' familiarity with the defendant. The court found that DeNardis met with the defendant face-to-face fifty-nine times over a period of one year and ten months. These meetings took place at the defendant's home, DeNardis' office, and police stations. DeNardis met with the defendant as often as five to six times per month and the meetings

averaged between five and twenty minutes. DeNardis last saw the defendant on April 1, 2015, and identified the defendant only sixteen days later on April 17, 2015.[6] On the basis of these circumstances, the court concluded that "her identification is reliable under the totality of circumstances based on her essentially unchallenged level of contact with the defendant over an almost two year time period."

"At trial, DeNardis testified, among other things . . . that on April 17, 2015, she identified the defendant in a still photograph shown to her by New Haven police. She was shown at trial two segments from the surveillance video at Eddy's and identified the defendant as the person in the footage. At the conclusion of the trial, the court instructed the jury that 'identification is a question of fact for you to decide, taking into consideration all of the evidence that you have seen and heard in the course of the trial.' " *State* v. *Sumler*, supra, 199 Conn. App. 201.

"[The] jury found [the defendant] guilty of felony murder in violation of General Statutes § 53a-54c, murder in violation of General Statutes § 53a-54a (a), conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-134 (a) (2), and carrying a pistol without a permit in violation of General Statutes § 29-35 (a), and the trial court, *Vitale, J.*, found him guilty of criminal possession of a pistol or revolver in violation of General Statutes § 53a-217c (a) (1)." Id., 189. The defendant appealed from the judgment of conviction, claiming that the court "(1) improperly failed to recuse itself from the defendant's trial because [the trial judge] previously had signed warrants for the defendant's arrest and for the search of his home, (2) abused its discretion by allowing opinion testimony of the defendant's identity on video surveillance footage [and in a still photograph], and (3) improperly denied the defendant's motion to suppress statements that he made to a police officer while being transported to the police department." Id., 189–90.

This court affirmed the judgment of conviction, concluding that (1) the defendant's claim that the court improperly failed to recuse itself was unpreserved; (2) the court did not abuse its discretion by allowing the defendant's probation officer to identify the defendant in the still photograph and video surveillance footage at trial because, according to the test set forth in *Finan* and as applied by this court to a similar factual scenario in *State* v. *Holley*, 160 Conn. App. 578, 127 A.3d 221 (2015), rev'd on other grounds, 327 Conn. 576, 175 A.3d 514 (2018), the probation officer's identification of the defendant did not constitute an opinion on the ultimate issue in the case; and (3), the court did not improperly deny the defendant's motion to suppress certain evidence. *State* v. *Sumler*, supra, 199 Conn. App. 195, 202–204. Following the release of this court's decision, the

defendant filed a petition for certification to appeal with our Supreme Court on September 3, 2020.

After the defendant filed his petition for certification to appeal our decision in *State* v. *Sumler*, supra, 199 Conn. App. 187, our Supreme Court decided *Gore* and *Bruny*. *Gore* effectively "amend[ed] § 7-3 (a) of the Connecticut Code of Evidence to incorporate an exception to the ultimate issue rule for lay opinion testimony that relates to the identification of persons depicted in surveillance video or photographs . . . ."[7] *State* v. *Gore*, supra, 342 Conn. 133. *Gore* overruled *Finan* and set forth new factors for courts to consider when determining whether opinion testimony regarding the identity of an individual in a surveillance video or photograph is admissible.[8] Id., 148–49. Specifically, the court in *Gore* articulated a new standard requiring courts to consider whether, under the totality of the circumstances, a witness is more likely to correctly identify the defendant than is the jury. Id., 150–51. This standard replaced the rule in *Finan* that required courts to determine whether testimony from a witness about an individual's identity in surveillance video or photographs was barred by § 7-3 (a) as an opinion on the ultimate issue in the case. *State* v. *Finan*, supra, 275 Conn. 66.

On May 17, 2022, after the release of our Supreme Court's decision in *Gore*, our Supreme Court granted the defendant's petition for certification only "as to the defendant's claim that the testimony of the defendant's former probation officer identifying the defendant in a still photograph and video surveillance footage constituted impermissible opinion testimony on the ultimate issue . . . ." *State* v. *Sumler*, supra, 343 Conn. 916. It denied the petition for certification "as to all other claims presented for review."[9] Id. Subsequently, our Supreme Court vacated in part this court's judgment in *State* v. *Sumler*, supra, 199 Conn. App. 187, and remanded the case to this court to reconsider the defendant's claim regarding the allegedly improper opinion testimony, in light of the new rule set forth in *Gore*. *State* v. *Sumler*, supra, 345 Conn. 961.

On June 3, 2022, this court ordered the parties to file supplemental briefs addressing "the defendant's claim that the testimony of the defendant's former probation officer identifying the defendant in a still photograph and video surveillance footage constituted impermissible opinion testimony on the ultimate issue in light of our Supreme Court's decisions in [*Bruny*] and [*Gore*]." Both parties submitted supplemental briefs and this court subsequently heard oral argument.[10] Additional facts will be set forth as necessary.

The sole question presented to us on remand is whether the trial court abused its discretion by admitting opinion testimony from the defendant's probation officer identifying the defendant in the photograph and surveillance video. The defendant argues that the court

abused its discretion because, in his view, the *Gore* factors weigh against admitting DeNardis' testimony identifying the defendant. The state argues that the court did not abuse its discretion because the *Gore* factors weigh in favor of admitting DeNardis' testimony. We agree with the state.

The following standard of review and legal principles are relevant to our resolution of this appeal. Whether to admit opinion testimony identifying an individual in a surveillance video or photograph is an evidentiary ruling that will not be disturbed unless it amounts to an abuse of discretion. See *State* v. *Gore*, supra, 342 Conn 159–63; see also *State* v. *Rivera*, 169 Conn. App. 343, 371, 150 A.3d 244 (2016) ("[t]he trial court has wide discretion in its rulings on evidence and its rulings will be reversed only if the court has abused its discretion or an injustice appears to have been done" (internal quotation marks omitted)), cert. denied, 324 Conn. 905, 152 A.3d 544 (2017).

As discussed previously in this opinion, *Gore* effectively "amend[ed] § 7-3 (a) of the Connecticut Code of Evidence to incorporate an exception to the ultimate issue rule for lay opinion testimony that relates to the identification of persons depicted in surveillance video or photographs . . . ." *State* v. *Gore*, supra, 342 Conn. 133. "[Our Supreme Court] now hold[s] that opinion testimony that relates to the identification of persons depicted in surveillance video or photographs is not inadmissible solely because it embraces an ultimate issue. Lay opinion testimony identifying a person in surveillance video or photographs is admissible if that testimony meets the requirements of § 7-1 of the Connecticut Code of Evidence. That is, such testimony is admissible if the opinion is rationally based on the perception of the witness and is helpful to a clear understanding of the testimony of the witness or the determination of a fact in issue." (Footnote omitted; internal quotation marks omitted.) Id., 148; see also Conn. Code Evid. § 7-1.[11]

"Testimony identifying a defendant as depicted in surveillance video or photographs meets the requirements of § 7-1 of the Connecticut Code of Evidence and is therefore admissible if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph [or video] than is the jury. . . . In making this determination, *we evaluate the following four factors, considering the totality of the circumstances*: (1) the witness' general level of familiarity with the defendant's appearance . . . (2) the witness' familiarity with the defendant's appearance, including items of clothing worn, at the time that the surveillance video or photographs were taken . . . (3) a change in the defendant's appearance between the time the surveillance video or photographs were taken and trial, or the subject's use of a disguise

in the surveillance footage . . . and (4) the quality of the video or photographs, as well as the extent to which the subject is depicted in the surveillance footage." (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Bruny*, supra, 342 Conn. 181–82, citing *State* v. *Gore*, supra, 342 Conn. 151. Because we consider the totality of the circumstances to determine whether opinion testimony identifying an individual is admissible, no single factor is dispositive. *State* v. *Bruny*, supra, 184.

Accordingly, turning our attention to the present case, we must apply the factors set forth in *Gore* to determine whether DeNardis was more likely than the jury to identify correctly the defendant from the photograph and video testimony, thereby meeting the requirements of § 7-1 of the Connecticut Code of Evidence. The first factor—the witness' general level of familiarity with the defendant's appearance—strongly weighs in favor of admitting DeNardis' testimony with respect to the defendant's identity in the photograph and surveillance video. "In order for the witness' general familiarity with the defendant's appearance to weigh in favor of admitting such testimony, the proponent of the testimony must demonstrate that the witness possesses more than a minimal degree of familiarity with the defendant. . . . [If] a witness who is familiar with the defendant's appearance views surveillance video or photographs that may or may not depict him, that witness brings to the task of identification an ability the jury cannot acquire in the context of a criminal trial. The witness' process of recognition is informed by having observed the defendant in different contexts, over an extended period of time. That wealth of experience renders the testimony helpful to the jury." *State* v. *Gore*, supra, 342 Conn. 164.

To determine whether a witness has sufficient general familiarity with the defendant, courts may consider a number of relevant circumstances indicative of the witness' relationship with the defendant and, in turn, the reliability of the witness' identification. Id., 159. "[C]ourts should consider the particular, relevant circumstances, including, but not limited to, the frequency, number and duration of any individual prior contacts; the duration of the entire course of contacts and the length of time since the contacts; the relevant viewing conditions; and the nature of the relationship between the witness and the defendant, if any." Id.

In the present case, the court, although it was evaluating the admissibility of the testimony using a different standard, considered the circumstances described in the preceding paragraph and concluded that "DeNardis possessed sufficient relevant familiarity with the defendant . . . ." Specifically, the court found that DeNardis had known the defendant for one year and ten months in her role as the defendant's probation officer.

DeNardis first met the defendant during an intake interview on May 28, 2013, and last met with the defendant on April 1, 2015.[12] In that time, DeNardis met with the defendant face-to-face fifty-nine times in a variety of settings. DeNardis met with the defendant as often as five to six times per month, and the meetings averaged between five and twenty minutes. These regular meetings took place at the defendant's home, DeNardis' office, and police stations. On the basis of the frequency, number, and duration of their past contacts, the duration of their relationship and time since their last meeting, the relevant viewing conditions and, finally, the nature of their relationship, DeNardis clearly had more than a minimal degree of familiarity with the defendant that enabled her to identify him more reliably than the jury.

The second factor—the witness' familiarity with the defendant's appearance, including items of clothing worn at the time that the surveillance video or photographs were taken—also weighs in favor of admitting DeNardis' testimony about the identity of the defendant in the surveillance video and photograph. The defendant wore eyeglasses throughout the trial.[13] At the time of the surveillance video, however, the defendant was not wearing eyeglasses. DeNardis was familiar with the defendant's appearance at the time, having seen the defendant only five days before the surveillance video was recorded. During that time, the defendant was not known to wear eyeglasses.[14] DeNardis was also familiar with the lanyard that the defendant was wearing around his neck in the surveillance video. In their past interactions, DeNardis had seen the defendant wear a similar lanyard. The lanyard depicted in the surveillance video resembled a lanyard that the defendant wore attached to his employee identification card. See *United States* v. *Saniti*, 604 F.2d 603, 605 (9th Cir.) (per curiam) (court properly admitted identification testimony of witnesses who were able to identify clothing worn by individual in surveillance photographs as clothing that belonged to defendant), cert. denied, 444 U.S. 969, 100 S. Ct. 461, 62 L. Ed. 2d 384 (1979); see also *United States* v. *Pierce*, 136 F.3d 770, 775 (11th Cir.) (court properly admitted identification of defendant by witness familiar with defendant's appearance when wearing baseball hat and sunglasses, items defendant was wearing in surveillance photograph), cert. denied, 525 U.S. 974, 119 S. Ct. 430, 142 L. Ed. 2d 350 (1998).[15] DeNardis' familiarity with the defendant's appearance at the time of the video and with the lanyard worn by the defendant in the video enabled her to identify him more reliably than the jury.

The third factor, which calls on us to consider whether there has been a change in the defendant's appearance between the time the surveillance video or photographs were taken and trial, or whether the subject used a disguise, also weighs in favor of admitting DeNardis' identification testimony. As previously dis-

cussed in this opinion, the defendant wore eyeglasses at trial but was not known to wear eyeglasses when the surveillance video was recorded. Although we agree with the defendant that his wearing of eyeglasses in the presence of the jury at the time of the trial does not amount to a disguise, this change in the defendant's appearance put DeNardis in a better position to identify the defendant than the jury, which had only seen the defendant wearing eyeglasses. See, e.g., *United States* v. *Walker*, 974 F.3d 193, 205 (2d Cir. 2020) (court properly admitted testimony identifying defendant when defendant wore eyeglasses at trial but was not wearing eyeglasses in surveillance video), cert. denied, U.S. , 141 S. Ct. 2823, 210 L. Ed. 2d 943 (2021).

The defendant argues that his wearing of eyeglasses throughout trial did not significantly change his appearance. Specifically, the defendant argues that, because the eyeglasses did not obstruct his face from view, we should not conclude that the third *Gore* factor weighs in favor of admitting DeNardis' testimony. The third factor, however, does not require a significant change in the defendant's appearance or that the change in appearance obstructs the view of the defendant in the surveillance video or photograph. Rather, we must determine if there has been *a change* in the defendant's appearance. We are not persuaded that a witness who is familiar with an individual's appearance without eyeglasses is unable to better identify that individual, when the individual is not wearing eyeglasses, than a jury who has only seen the individual wearing eyeglasses.

Finally, the fourth factor, which addresses the quality of the video or photographs, as well as the extent to which the subject is depicted in the surveillance video or photograph, also weighs in favor of admitting DeNardis' testimony. The video contained views from directly behind Eddy's counter where the cash register is located, a side view adjacent to the counter, a view of the outside of the store, and a view from inside the store showing the entry door.[16] Depending on the view of the camera, the defendant's face in the video is more or less obscured, and the defendant is not the only person in the surveillance video or photograph. The photograph, which was taken from the surveillance video, shows the body of the individual identified as the defendant largely obscured by the store counter. The defendant is wearing a hoodie and facing the camera. In the photograph, Eddy's store clerk is pictured in the foreground and the defendant is in the middle ground of the photograph. Simply put, the defendant was not clearly, fully, or solely depicted in either the surveillance video or the photograph.

Turning to the quality of the surveillance video and the photograph, the court described the video as being "clear enough . . . ." "With respect to the quality of the video or photographs . . . this factor favors admis-

sibility when the [video or] photographs are not either so unmistakably clear or so hopelessly obscure that the witness is no [better suited] than the jury to make the identification." (Internal quotation marks omitted.) *State* v. *Gore*, supra, 342 Conn. 164–65. Thus, the surveillance video and the still photograph taken from it were neither unmistakably clear nor hopelessly obscure and fall within the range of quality that favors admissibility.

The quality of the surveillance video and the photograph, as well as the extent to which the defendant was depicted in them, both lead us to conclude that the fourth factor also weighs in favor of admitting DeNardis' testimony identifying the defendant. See, e.g., *State* v. *Davis*, supra, 344 Conn. 143–44 (quality of video favored admission of witness' testimony identifying defendant when video showed defendant with his face obscured at certain angles and wearing hat and winter jacket); see also, e.g., *United States* v. *Jackman*, 48 F.3d 1, 5 (1st Cir. 1995) (court properly admitted witnesses' identifications of individual pictured in somewhat blurred photographs that showed only part of individual's face).

The defendant argues on remand that the state already conceded that the video was of clear quality.[17] We do not agree. At oral argument before this court, the state denied making any concession to the clear quality of the video. The defendant appears to mistakenly rely on the state's reference to the court's description of the video as being "clear enough" for an individual to make an identification, to support his claim that the state conceded to the court's recognition of the clarity of the video. The terms "clear enough" and "clear" are distinguishable from each other for purposes of the fourth *Gore* factor, which favors the admission of surveillance video and photographs that are neither "so unmistakably clear or so hopelessly obscure . . . ." *State* v. *Gore*, supra, 342 Conn. 165. Although the jury may have been able to compare the defendant as he appeared before it at trial to the surveillance video and photograph, DeNardis was in a better position to reliably identify him.

Finally, the defendant argues that it was neither DeNardis' general familiarity with the defendant, nor her specific familiarity with the defendant's appearance at the time the surveillance video was recorded, that enabled her to identify the defendant. Rather, the defendant argues that DeNardis was able to identify the defendant only because of the clarity of the surveillance video and photograph and the " 'unobstructed view' " of the defendant depicted in them. Simply put, the defendant asserts that DeNardis was equally as well situated as the jury to identify the defendant. First, as we articulated in our preceding analysis of the fourth factor, we are not persuaded by the defendant's argument that the surveillance video or photograph shows

the defendant clearly and without obstruction. Furthermore, even if we assume, arguendo, that the surveillance video and photograph provide a clear and unobstructed view of the defendant, the clarity of the surveillance video or photograph is only one of the four factors set forth in *Gore*. We consider the *Gore* factors in their totality and, thus, a single factor is not dispositive. Accordingly, the defendant's argument that DeNardis was able to identify him only because he clearly was depicted in the surveillance video and photograph is unpersuasive and ignores the weight that we must give to the first, second, and third factors.

For the foregoing reasons, the factors articulated in *Gore* all weigh in favor of admitting DeNardis' testimony about the identity of the defendant in the photograph and surveillance video. Given the totality of the circumstances, the court did not abuse its discretion by admitting DeNardis' testimony.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Our Supreme Court vacated in part this court's judgment in *State* v. *Sumler*, 199 Conn. App. 187, 235 A.3d 576 (2020), vacated in part, 345 Conn. 961, A.3d (2022). In *Sumler*, this court addressed the defendant's three claims made on appeal, namely, that the trial court "(1) improperly failed to recuse itself from the defendant's trial, (2) abused its discretion by allowing opinion testimony of the defendant's identity on video surveillance footage [and in a still photograph], and (3) improperly denied the defendant's motion to suppress statements that he made to a police officer . . . ." *State* v. *Sumler*, supra, 199 Conn. App. 189–90. We disagreed with his claims and affirmed the trial court's judgment. Id., 190. Subsequently, the defendant filed a petition for certification that our Supreme Court granted in part. See *State* v. *Sumler*, 343 Conn. 916, 274 A.3d 867 (2022). The defendant's petition for certification was granted as to his second claim, that is, that the court abused its discretion by allowing opinion testimony with respect to the defendant's identity in the video surveillance footage and still photograph. Id. Our Supreme Court subsequently issued a corrected order on the defendant's petition for certification in which it vacated this court's judgment as it pertained to the defendant's claim that the court abused its discretion by allowing opinion testimony with respect to the defendant's identity. *State* v. *Sumler*, 345 Conn. 961, A.3d (2022). The petition for certification was denied as to the defendant's other claims. Id. Thus, our judgment in *State* v. *Sumler*, supra, 199 Conn. App. 187, was unaffected as it pertains to those claims, namely, that the trial court improperly declined to recuse itself and improperly denied the defendant's motion to suppress. Thus, our prior decision as to those claims remains in effect. Further procedural history will be set forth in more detail in the facts and procedural history section of this opinion.

[2] The new rule and factors set forth in *Gore* were rearticulated in our Supreme Court's decision in *Bruny*. The standard set forth in the two opinions for admitting lay opinion testimony about the identity of an individual in surveillance video or photographs is the same. Going forward, the new standard set forth in *Gore* and *Bruny* will be referred to simply by reference to *Gore*.

[3] "A 'dutch' is a marijuana filled cigar." *State* v. *Sumler*, supra, 199 Conn. App. 190 n.2.

[4] We read the motion in limine to have requested that DeNardis be precluded from testifying about the identity of the defendant in both the photograph taken from the surveillance video and the surveillance video itself. The motion in limine asked the court to exclude DeNardis' testimony concerning the identification of the defendant in the surveillance video. During the hearing on the motion in limine, the court established that the photograph in which DeNardis identified the defendant was undisputedly taken from the surveillance video. The state intended to elicit testimony from DeNardis regarding her identification of the defendant in the photograph. The state

also intended to have DeNardis attempt to identify the defendant in the surveillance video when she viewed the video for the first time at trial before the jury. Thus, the motion in limine sought to preclude DeNardis from testifying about the identity of the defendant in the surveillance video itself as well as the identity of the defendant in the photograph taken from the surveillance video.

[5] "The court summarized its findings as follows: 'The record reflects that . . . DeNardis is not claimed to be an eyewitness to the crime that occurred in Pay Rite . . . and, further, that the crime now before the court did not occur at Eddy's . . . .' The court then explained that the proffered evidence 'does not encompass an ultimate issue before the jury, namely, whether the defendant was one of the individuals present inside of the Pay Rite . . . at the time the crimes before the jury were committed.' It explained that the jury could 'view the tape, the still photograph from the tape, and the defendant himself to determine if he is the person depicted in the video or not.' " *State* v. *Sumler*, supra, 199 Conn. App. 200–201.

[6] The trial court stated that DeNardis last saw the defendant on April 1, 2015, and identified the defendant on April 17, 2015. The court, however, mistakenly stated that DeNardis last saw the defendant "approximately five days before the alleged crime . . . ."

[7] Section 7-3 of the Connecticut Code of Evidence provides in relevant part: "(a) General Rule. Testimony in the form of an opinion is inadmissible if it embraces an ultimate issue to be decided by the trier of fact, except that, other than as provided in subsection (b), an expert witness may give an opinion that embraces an ultimate issue where the trier of fact needs expert assistance in deciding the issue. . . . "

[8] The court in *Gore* stated: "To the extent that this court's decision in *Finan* is inconsistent with the rule we adopt today, that decision and its progeny; see *State* v. *Holley*, supra, 160 Conn. App. 578; *State* v. *Felder*, [99 Conn. App. 18, 912 A.2d 1054 (2007)]; are overruled." *State* v. *Gore*, supra, 342 Conn. 148–49. The court in *Finan* interpreted § 7-3 (a) of the Connecticut Code of Evidence to bar the admission of a witness' opinion testimony about the identification of the defendant as a perpetrator of the crime at issue because the testimony encompassed an ultimate issue in the case. *State* v. *Finan*, supra, 275 Conn. 66.

[9] The May 17, 2022 order states: "The petition is granted as to the defendant's claim that the testimony of the defendant's former probation officer identifying the defendant in a still photograph and video surveillance footage constituted impermissible opinion testimony on the ultimate issue and denied as to all other claims presented for review. It is further ordered that the case is remanded to the Appellate Court with direction to consider the defendant's claim regarding the allegedly improper opinion testimony in light of this court's decisions in *State* v. *Bruny*, [supra] 342 Conn. 169, and *State* v. *Gore*, [supra] 342 Conn. 129 . . . ." *State* v. *Sumler*, supra, 343 Conn. 916. On October 20, 2022, our Supreme Court issued a corrected order on the petition for certification that included the same language but also vacated in part the Appellate Court's judgment in *State* v. *Sumler*, supra, 199 Conn. App. 187. *State* v. *Sumler*, supra, 345 Conn. 961.

[10] After the parties submitted their supplemental briefs, our Supreme Court issued its decision in *State* v. *Davis*, 344 Conn. 122, 145, 277 A.3d 1234 (2022), in which it applied the *Gore* factors retroactively. In *Davis*, the defendant argued that it would be improper to apply *Gore* retroactively. Id., 144–45. Our Supreme Court was not persuaded and stated that, "as a general rule, judicial decisions apply retroactively to pending cases . . . . A common-law decision will be applied nonretroactively only if: (1) it establishes a new principle of law, either by overruling past precedent on which litigants have relied . . . or by deciding an issue of first impression whose resolution was not clearly foreshadowed . . . (2) given its prior history, purpose and effect, retrospective application of the rule would [impede] its operation; and (3) retroactive application would produce substantial inequitable results, injustice, or hardship. . . .

"Moreover, it is axiomatic that [t]he issue of retroactivity of decisional law is a question of policy to be decided by [this court], and may be decided by the policy consideration of whether litigants could be deemed to have relied on past precedent or whether the new resolution of an old issue was foreshadowed, or whether equity, given the particular facts, requires a prospective application only. . . . In the present case, it is unpersuasive to suggest that this court's present application of the standard set forth in *Gore* gives rise to any of the concerns set forth in the preceding paragraph. That is, although *Gore* does establish a new principle of law by overruling

past precedent, the defendant has not argued, let alone demonstrated, that he relied to his detriment on one legal standard over another during the events underlying this case, the underlying trial, or in bringing the present appeal . . . despite being afforded an opportunity to do so in the supplemental briefing ordered by this court to address the applicability of *Gore* to this case." (Citations omitted; internal quotation marks omitted.) Id., 145–46. Our Supreme Court went on to note that, even if *Gore* had not been applied retroactively, application of the rule in *Finan* would reach the same result. Id., 149. In the present case, neither the defendant nor the state argue against applying *Gore* retroactively.

[11] Section 7-1 of the Connecticut Code of Evidence provides: "If a witness is not testifying as an expert, the witness may not testify in the form of an opinion, unless the opinion is rationally based on the perception of the witness and is helpful to a clear understanding of the testimony of the witness or the determination of a fact in issue."

[12] DeNardis remained the defendant's probation officer until April 15, 2015.

[13] Both DeNardis and another witness described the defendant as wearing eyeglasses in court.

[14] Another witness, who had known the defendant during the time the surveillance video was recorded, testified that he had never seen the defendant wear eyeglasses prior to trial.

[15] "Because § 7-1 of the Connecticut Code of Evidence essentially mirrors rule 701 of the Federal Rules of Evidence, we look to federal decisions for guidance in determining whether the trial court . . . acted within its discretion in allowing the testimony." (Footnote omitted.) *State* v. *Gore*, supra, 342 Conn. 149.

[16] The court found that "[t]he tape has four different perspectives and the tape is divided into four segments. Those segments are a view directly behind the counter where the cash register is located, a side view adjacent to the counter, a view of the outside of the store depicting the sidewalk, and the streets and a view of the exterior of the front door as well as a view from inside the store showing the entry door. The tape lasts in total approximately fifteen minutes. There are several individuals depicted walking or standing during the video. So the defendant is not the only person depicted in the video . . . ."

[17] The defendant refers us to the state's principal brief in *State* v. *Sumler*, supra, 199 Conn. App. 187, in which it argued: "The trial court found that, unlike, the 'brief and difficult to discern' videotape in [*Finan*] . . . the clear quality of Eddy's videotape gave a basis for making an identification as a matter of fact and not mere suspicion . . . ." The state's statement, however, relies on the court's description of the surveillance video as being "clear enough . . . ." The court never described the surveillance video as having a "clear quality."