******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ECKER, J., with whom McDONALD, J., joins, concurring in part and concurring in the judgment. I agree with and join part III of the majority opinion, but I write separately to express my disagreement with part II, in which the majority holds that the trial court properly admitted evidence that the victim's brother, John May, had identified the defendant, Richard Evans, from a still photograph taken from video surveillance footage recorded around the time of the victim's murder. I concur in the result reached by the majority only because I find that this evidentiary error was harmless.

I

In *State* v. *Gore*, 342 Conn. 129, 132–33, 269 A.3d 1 (2022), this court overruled *State* v. *Finan*, 275 Conn. 60, 881 A.2d 187 (2005), and amended the common-law evidentiary rule codified in § 7-3 (a) of the Connecticut Code of Evidence to permit a lay witness to identify a defendant from video surveillance footage, even though the identification embraces an ultimate issue of fact to be decided by the jury. In doing so, we recognized that a lay witness, unlike an eyewitness to a crime, typically is "on the same footing" as the jury because neither the lay witness nor the jury was present when the crime occurred, and "the video or photographs in evidence are physically present in the courtroom. So is the defendant. The jury is therefore able to compare the defendant with the video or photographs" and to make an identification. *State* v. *Gore*, supra, 150. "Accordingly," we concluded, "as a general rule, that nonpercipient lay opinion testimony identifying a defendant in surveillance video or photographs is admissible only if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph [or video] than is the jury." (Internal quotation marks omitted.) Id.

To determine whether a witness' identification of a defendant from video surveillance footage or photographs is admissible, courts must "evaluate the totality of the circumstances," considering the following four, nonexclusive "factors relevant to determining whether the witness is more likely to correctly identify the defendant than is the jury: (1) the witness' general level of familiarity with the defendant's appearance . . . (2) the witness' familiarity with the defendant's appearance, including items of clothing worn, at the time that the surveillance video or photographs were taken . . . (3) a change in the defendant's appearance between the time the surveillance video or photographs were taken and trial, or the subject's use of a disguise in the surveillance footage . . . and (4) the quality of the video or photographs, as well as the extent to which the subject is depicted in the surveillance footage." (Citations omitted.) Id., 150–51.

We took pains to emphasize in *Gore* that this is not a "low standard"; id., 158; or "a mere rubber stamp on the road to admissibility." Id., 157. To provide "sufficient protection to criminal defendants against good faith mistaken identifications . . . the proponent of the testimony [must] demonstrate that the witness possesses more than a minimal degree of familiarity with the defendant." Id., 159. Although we declined to adopt a bright-line rule and therefore left open "the possibility that, under some circumstances, a single encounter will be sufficient"; id.; we indicated that such a circumstance would be rare by providing "[s]ome illustrative examples of persons who may satisfy this standard . . . ." Id., 164. Tellingly, those examples identify the typical relationships that produce such familiarity: "friends, longtime acquaintances, neighbors, coworkers, family members, and former classmates."[1] Id.

---

[1] To explain the advantageous perspective provided by the kind of familiarity we had in mind in *Gore*, we quoted the following observation made by the United States Court of Appeals for the Fourth Circuit: " '[T]estimony

Today's decision, issued just over three short years later, stands the *Gore* paradigm on its head. The majority concludes that the nonpercipient lay witness in this case, May, generally was familiar with the defendant's appearance under the first *Gore* factor, even though he was not anything like a friend, acquaintance, neighbor, coworker, or former classmate of the defendant. Quite the opposite. May had met the defendant only one time, for thirty to forty-five minutes, approximately one and one-half months before he was asked to identify the defendant from a still photograph derived from video surveillance footage recorded on the night that May's brother was murdered. May's isolated and brief interaction with the defendant was insufficient to provide him with the type of general familiarity necessary to make him more likely than the jury to correctly identify the defendant. See *State* v. *Bruny*, 342 Conn. 169, 183, 269 A.3d 38 (2022) (concluding that witness who "barely qualifie[d] as a casual acquaintance" had "[a] low degree of familiarity with the defendant [that cast] doubt on the reliability of her identification of him in the surveillance footage").

The short and singular nature of May's interaction with the defendant meant that the two men most accurately may be described, not as friends or even acquaintances, but as strangers. Although "the concept of familiar-

by those who knew defendants over a period of time and in a variety of circumstances offers to the jury a perspective it could not acquire in its limited exposure to defendants. Human features develop in the mind's eye over time. These witnesses had interacted with defendants in a way the jury could not, and in natural settings that gave them a greater appreciation of defendants' normal appearance. Thus, their testimony provided the jury with the opinion of those whose exposure was not limited to three days in a sterile courtroom setting.' " *State* v. *Gore*, supra, 342 Conn. 152, quoting *United States* v. *Allen*, 787 F.2d 933, 936 (4th Cir. 1986), vacated on other grounds, 479 U.S. 1077, 107 S. Ct. 1271, 94 L. Ed. 2d 132 (1987); see also *United States* v. *Allen*, supra, 936 ("less than clear" quality of photographs, which provided only "limited glimpses" of individual depicted, rendered testimony of witnesses familiar with defendant more helpful to jury).

ity encompasses a broad range of possibilities"; *State* v. *Gore*, supra, 342 Conn. 162; a "stranger's onetime brief encounter" does not qualify as the type of "familiarity [that] increases the accuracy of identifications" made from video surveillance footage and photographs sufficient to render them admissible. Id., 162–63. As we explained in *Gore*, "stranger identifications" are less reliable than "familiar identifications" and lead to the risk of good faith misidentifications.[2] Id., 161–62; cf. *State* v. *Guilbert*, 306 Conn. 218, 262, 49 A.3d 705 (2012) (eyewitness to shooting "was not so familiar with the defendant that the risk of misidentification was insignificant"). Indeed, even in the context of identifications made by percipient witnesses to crimes, "scientific developments abundantly [demonstrate] the many vagaries of memory encoding, storage and retrieval; the malleability of memory; the contaminating effects of extrinsic information; the influence of police interview techniques and identification procedures; and the many other factors that bear on the reliability of [such] identifications." (Internal quotation marks omitted.) *State* v. *Gore*, supra, 160.

These scientific variables are pertinent to the admissibility of May's identification testimony under the totality of the circumstances.[3] Most worrisome is the particular

---

[2] Because a good faith misidentification is an honest mistake regarding identity, rather than a lie or prevarication, the majority misses the mark when it observes that "[t]he trial court was able to observe May's demeanor and manner during this time and to evaluate his credibility." Part II of the majority opinion. Scientific data establish that "there is little or no correlation between confidence and accuracy; in other words, an eyewitness' confidence in the accuracy of an identification is not a reliable indicator of the identification's true accuracy." *State* v. *Guilbert*, 306 Conn. 218, 227, 49 A.3d 705 (2012). Stated another way, a witness may genuinely, but mistakenly, believe that his or her identification is accurate and reliable.

[3] I agree with the majority that the *Gore* factors "are not exhaustive" and "may not capture the full range of considerations relevant in every case." Part II of the majority opinion. The sequencing of the photographic array and the still photograph clearly is part of the totality of the circumstances relevant to assessing the admissibility of May's identification of the defendant and, therefore, should have been considered by the trial court, regard-

methodology used by the police to procure May's identification of the defendant, which cast serious doubt on its reliability. May testified that, on August 10, 2017, forty-three days after his onetime encounter with the defendant, the police showed him a photographic array and asked him to identify the person who had argued with the victim on June 28, 2017. May identified the defendant from the array. Then, the police showed the defendant a still photograph from the video surveillance footage recorded on the night of the victim's murder, July 2, 2017, and asked him if he recognized the person pictured. May identified the person in the still photograph as the defendant. The sequential nature of these two identification procedures plainly risked contaminating May's second identification—the one at issue in this appeal—due to confirmation bias.[4] Cf. R. Wise et

less of whether that consideration is viewed through the prism of one of the *Gore* factors or as an additional factor pertinent to this case.

The majority declines to consider these scientific variables "without clearer record evidence that the same science and rationale" applicable to eyewitness identifications also is applicable to familiar identifications. Footnote 12 of the majority opinion. The majority allows the labels (eyewitness versus familiar) to obscure the fact that May's identification of the defendant was based on his eyewitness perception of him on a single occasion—the altercation between the victim and the defendant rather than the homicide itself—which makes the two circumstances indistinguishable for purposes of the scientific evidence regarding misidentification. Although May was an eyewitness to an earlier event rather than the homicide itself, like an eyewitness, he lacks the general familiarity necessary to "[render] an identification significantly more reliable than stranger identifications." *State* v. *Gore*, supra, 342 Conn. 162. Because May had only a minimal degree of familiarity with the defendant, his identification of the defendant was not "sufficiently reliable to allay concerns regarding a lack of available procedural protections against a mistaken identification." Id.

[4] Contrary to the majority's assertion, it is clear from the record that May was first shown the photographic array, from which he identified the defendant, and then subsequently was shown the still photograph from the video surveillance footage, from which he identified the defendant. See footnote 14 of the majority opinion. During the hearing on the admissibility of May's identification testimony, the following colloquy occurred:

"[The Prosecutor]: Now, during the time that the statement in Virginia took place, which was on August 10, 2017, did the police show you any photographs?

al., "How To Analyze the Accuracy of Eyewitness Testimony in a Criminal Case," 42 Conn. L. Rev. 435, 462 (2009) ("the influence of confirmation biases (e.g., asking the eyewitness specifically about the suspect while not asking those same questions about [others])" is "likely to cause eyewitness misidentifications" (internal quotation marks omitted)).

By showing May a photograph of the defendant in connection with the altercation on June 28, 2017, and asking him immediately thereafter to identify the person pictured in the still photograph taken from the video surveillance footage recorded on the night of the victim's murder on July 2, 2017, the police made two well-known methodological errors. First, they created a significant risk that May's identification of the second photograph would be influenced by a cognitive bias formed in his mind as part of the first identification he made involving a different event. Cf. S*immons* v. *United States*, 390 U.S. 377, 383–84, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968) (risk of misidentification with sequential identifications exists because "the witness thereafter is apt to retain in his memory the image of the photograph rather than of the person actually seen, reducing the trustworthiness of [any] subsequent . . . identification"). Second, the procedure was tainted by the implied but unmistakable suggestion that the police believed the two incidents were connected and that the person involved in the altercation with the victim on June 28, 2017, the defendant, was a suspect in the victim's mur-

---

"[May]: Yes, sir.

"[The Prosecutor]: Did they show you a photo[graphic] array, a series of pictures that they presented?

"[May]: Yes.

"[The Prosecutor]: Okay. *And then* did they show you a still photograph from a video?

"[May]: Hm-hmm." (Emphasis added.)

May's testimony thus plainly establishes that he was first shown the photographic array "[a]nd then" the still photograph.

der four days later. See *State* v. *Marquez*, 291 Conn. 122, 143, 967 A.2d 56 (risk of misidentification exists when "the photographs used were selected or displayed in such a manner as to emphasize or highlight the individual whom the police believe is the suspect"), cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009).

May's identification of the defendant also was undermined by the lengthy passage of time, forty-three days, between the one time he saw the defendant and the date on which he was asked to identify the defendant from a photographic array and still photograph. As we previously have recognized, "a person's memory diminishes rapidly over a period of hours rather than days or weeks . . . ." (Footnotes omitted.) *State* v. *Guilbert*, supra, 306 Conn. 238. The reality of memory decay is accepted in the scientific community and recognized in our case law.[5] See, e.g., *State* v. *Bruny*, supra, 342 Conn. 183–84 (witness who "barely qualifie[d] as a casual acquaintance" lacked general familiarity with

---

[5] "Science has proven that memory is malleable," and "an array of variables can affect and dilute memory and lead to misidentifications." *State* v. *Henderson*, 208 N.J. 208, 247, 27 A.3d 872 (2011). One of those variables is "memory decay," which " 'is irreversible'; memories never improve. . . . A meta-analysis of fifty-three 'facial memory studies' confirmed 'that memory strength will be weaker at longer retention intervals [the amount of time that passes] than at briefer ones.' . . . In other words, the more time that passes, the greater the possibility that a witness' memory of a perpetrator will weaken," and the more unreliable the witness' identification becomes. (Citation omitted.) Id., 267, quoting K. Deffenbacher et al., "Forgetting the Once-Seen Face: Estimating the Strength of an Eyewitness's Memory Representation," 14 J. Experimental Psychology: Applied 139, 142 (2008); see also *Young* v. *Conway*, 698 F.3d 69, 84 (2d Cir. 2012) ("[R]esearch indicates that the passage of time both degrades correct memories and heightens confidence in incorrect ones. . . . According to studies, even a [one week] delay can cause the typical eyewitness viewing a perpetrator's face that [is] not highly distinctive . . . to have no more than a [50 precent] chance of being correct in his or her lineup identification." (Citations omitted; internal quotation marks omitted.)), cert. denied sub nom. *Unger* v. *Young*, 571 U.S. 1015, 134 S. Ct. 20, 187 L. Ed. 2d 409 (2013).

defendant, "particularly considering that more than one and one-half years had passed between the last time [the witness had seen] him and the first time she [had] viewed the surveillance footage"); *State* v. *Guilbert*, supra, 239 (recognizing that rapid decay of eyewitness' memory is "widely accepted by scientists"). Given the distorting effect of hindsight and the lengthy lapse of time between May's one and only encounter with the defendant and his identification of the defendant, as well as the flawed methodology used by the police to procure May's identification, I conclude that the first *Gore* factor, the witness' general level of familiarity with the defendant, clearly did not weigh in favor of admissibility.

Despite the foregoing facts, the majority concludes that May had more than a minimal degree of familiarity with the defendant because of the nature of his encounter with the defendant, which involved "directly" observing the defendant engage in a physical altercation with his brother. Text accompanying footnote 11 of the majority opinion. The encounter might have been direct in the sense that May had an unobstructed view of the defendant during some portion of that incident, but there was no evidence that the encounter was a particularly memorable event for May. May did not describe it as memorable; nor did he provide sufficient detail regarding the altercation to infer that it was memorable. According to May and another witness, Soccus Henderson, no one intervened to break up the fight, and no one called the police. Henderson described the fight as "a little altercation" that "was not really a big deal . . . ." There is no evidence that either the victim or the defendant sustained any injuries. In the absence of additional evidence, it is pure speculation to say that the nature of May's interaction with the defendant, which amounted to watching a scuffle between two men, was one that made an impression on May's memory.

The altercation likely took on importance only after the fact, through the lens of hindsight due to the victim's subsequent murder. But, by the time the police asked May to identify the defendant, forty-three days had passed. As discussed previously, the passage of one and one-half months between May's onetime opportunity to view the defendant and his identification of the defendant from the still photograph cast serious doubt on the reliability of his identification due to the rapid diminishment of memory "over a period of hours rather than days or weeks . . . ." (Footnotes omitted.) *State* v. *Guilbert*, supra, 306 Conn. 238.

The second *Gore* factor also does not favor the admission of May's identification of the defendant. See *State* v. *Gore*, supra, 342 Conn. 151. Indeed, the differences between the present case and *Gore* in this respect could not be starker. The witness in *Gore*, Caron Canty, had known the defendant "for half his life" and considered him to be "his cousin." Id., 165; see id., 136. We found that the state had established that Canty was familiar with the defendant's appearance when the surveillance video was recorded because "he spent several hours with the defendant both on the day of the shooting and the following day. In addition, at the time of the shooting, Canty saw the defendant regularly—he spent time with the defendant on most days. He was familiar with the type of clothing the defendant wore, describing him as favoring Nike outfits." Id., 165; see also *State* v. *Bruny*, supra, 342 Conn. 184 (witnesses saw defendant on day of shooting and, "therefore, were familiar with his appearance at the time that the surveillance footage was taken"); *State* v. *Sumler*, 217 Conn. App. 51, 66–67, 287 A.3d 211 (2022) (second *Gore* factor weighed in favor of admission of witness' testimony because witness saw defendant five days before crimes were committed wearing lanyard similar to that depicted in

surveillance video), cert. denied, 346 Conn. 914, 290 A.3d 376 (2023).

May, by contrast, did not see the defendant on the night the victim was murdered, so he was not familiar with the clothing that the defendant was wearing that night or any other distinctive aspects of the defendant's appearance at the time the surveillance video was recorded. More generally, May had nothing to offer about the type of clothing the defendant typically wore because he did not know the defendant and was unfamiliar with his style of dress or any other idiosyncratic physical attributes that would put him on a different footing from that of the jury to correctly identify the defendant from the photograph. See, e.g., *State* v. *Hamilton*, 352 Conn. 317, 321, 354, 336 A.3d 1188 (2025) (trial court properly admitted witness' photograph of defendant wearing "distinctive red and black Jordan 13 sneakers," which defendant was seen wearing in surveillance videos). Although May saw the defendant "just four days after May had seen and spoken with the defendant in person," proximity in time alone is insufficient to satisfy the second *Gore* factor. Part II of the majority opinion. This *Gore* factor, like the first, is concerned with the witness' *familiarity* with the defendant's appearance, whether it be general or specific, not the recency of the witness' opportunity to view the defendant in relation to the video-recorded event.

As to the third factor, the evidence in the record is manifestly insufficient to establish that there had been "a change in the defendant's appearance between the time the surveillance video or photographs were taken and trial . . . ." (Citation omitted.) *State* v. *Gore*, supra, 342 Conn. 151. During the hearing on the admission of May's identification testimony, the prosecutor asked May whether there "was anybody on that moving job [on June 28, 2017] present here in the courtroom today . . . ." May responded: "I mean, I don't see Richard.

He was there. Richard." The prosecutor asked whether the defendant, i.e., Richard, "was there," and May replied, "[y]es, sir." The prosecutor asked May to "point [Richard] out" for the jury, and May then identified the defendant. May clearly struggled to identify the defendant, but the record does not reflect the reason for his uncertainty, that is, whether the source of May's hesitation was his general lack of familiarity with the defendant's appearance, a change in the defendant's appearance, or some other reason not apparent on the record. Later, after May had described the altercation between the victim and the defendant on June 28, 2017, and his statements to the police and identifications of the defendant on August 10, 2017, the prosecutor asked May whether there had been a change in the defendant's appearance between "the one time you saw him in Virginia," and the trial court added, "[t]o the present . . . ." May responded, "I guess. I mean, you know, I guess, yeah." "I guess" is an exceedingly weak basis to conclude that May, who had seen the defendant once for no more than forty-five minutes, was in a better position than the jury to identify the person in the still photograph of the crime scene.

The trial court candidly acknowledged that there was not "a great deal of facts regarding what [the defendant] looked like in 2017" but made two observations to overcome the deficient record. "First of all, six years have passed. [The defendant] does have quite a bit of gray in his beard, and it's difficult from the surveillance video to see if there's any gray in the [beard of the] person depicted in the video . . . . But . . . a good six years have passed, suggesting that there may have been a change of appearance. [Second] [a]nd, just as [important], [the trial court] note[d] for the record that, when . . . May was first asked to identify anybody in the courtroom [who] was present during this interaction in Virginia, he looked around the courtroom a couple

times and, at least initially, did not recognize the defendant as the person who was involved in this altercation with [the victim]. To me, that's highly suggestive that [the defendant's] appearance has changed over the past six years."

The trial court's explanation clearly demonstrates that its finding that the defendant's appearance had changed was not based on evidence but on abject surmise and speculation. See, e.g., *State* v. *Lopez*, 341 Conn. 793, 807–808, 268 A.3d 67 (2022) (trial court's factual finding that airsoft gun was "firearm" as defined by General Statutes § 53a-3 (19) was clearly erroneous because, among other reasons, "[i]n the absence of . . . evidence, it is pure speculation whether the airsoft pellet gun is a toy designed for recreational use . . . or a weapon designed for violence and, therefore, a 'firearm' "). See generally *In re Jacob W.*, 330 Conn. 744, 770, 200 A.3d 1091 (2019) ("[a] finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed" (internal quotation marks omitted)). There was no evidence that the color of the defendant's beard had changed. The trial court itself confirmed that the still photograph does not reveal whether the person pictured had a beard tinged with gray hair, as the defendant had at the time of trial. This observation is an unequivocal acknowledgment by the finder of fact that the evidence is insufficient to demonstrate a change of physical appearance. Only then did the court move on to speculate that "*there may have been* a change of appearance" based on the mere fact that "a good six years [had] passed" since the time of the incident. This is not a factual finding; it is guesswork. See, e.g., *State* v. *Bemer*, 340 Conn. 804, 812, 266 A.3d 116 (2021) ("[a]t some point, the link between the facts

and the conclusion becomes so tenuous that we call it speculation" (internal quotation marks omitted)). Moreover, a finding based on mere possibility ("may have been") does not support a conclusion that the state had fulfilled its burden as the proponent of the evidence to prove a change in the defendant's appearance. See *State* v. *Gore*, supra, 342 Conn. 165 (third *Gore* factor did not weigh in favor of admission of identification testimony because "the record [did] not reflect whether the defendant's appearance [had] changed between the time the surveillance video was recorded and the time of trial").

It was likewise speculative for the trial court to find that May's hesitancy in identifying the defendant in court was "highly suggestive" that the defendant's appearance had changed. Again, this was not a factual finding based on the evidence; it was a flawed, logical conclusion based on the absence of evidence. The only *fact* noted by the court in support of its ruling was that, "when . . . May was first asked to identify anybody in the courtroom [who] was present during this interaction in Virginia, he looked around the courtroom a couple times and, at least initially, did not recognize the defendant as the person who was involved in this altercation with [the victim]." Based on that fact, the court concluded that May's difficulty was caused by the defendant's changed appearance. But this finding is also pure guesswork. It would be equally plausible, at the very least, to conclude that May hesitated to identify the defendant because he had no recollection of how the defendant looked six years ago. This alternative explanation is especially plausible due to May's lack of general familiarity with the defendant. Of course, there are other reasonable explanations for why May had difficulty identifying the defendant in court; the defendant may have been looking away, the witness may have been nervous, and so forth. The state had the burden of establishing a foundation for the admissibility

of May's identification under *Gore*, but it made no effort to create a record explaining the cause of May's hesitation. Nor did it offer any other evidence to show that the defendant's appearance had changed in any meaningful way. Because the trial court was left "to speculate among equally likely possibilities," its factual finding lacks evidentiary support. *State* v. *Lewis*, 303 Conn. 760, 775, 36 A.3d 670 (2012).

Nor can I conclude that May's equivocal response to the prosecutor's question of whether there had been a change in the defendant's appearance was sufficient. May's answer to the prosecutor's question—"I guess. I mean, you know, I guess, yeah"—demonstrates that he was guessing that the answer is "yeah." Although this response, shorn of the accompanying qualifier, can be characterized as an affirmative answer to the prosecutor's question, May's hesitancy, apparent confusion, and vagueness strip it of all reliability. Of equal concern to me is that the prosecutor did not attempt to clarify the basis for May's uncertainty as to whether there had been a change in the defendant's appearance. The prosecutor did not clear up whether May's equivocation arose because, six years on, he had no present memory of the defendant's appearance, or because the defendant was wearing different clothes, or because the defendant was seated rather than standing, or some other inconsequential change that would place May in no better position than the jury to identify the defendant from the still photograph. Given the absence of evidence in the record, the third *Gore* factor, like the first and second, weighs against the admission of May's identification testimony.[6]

---

[6] As the majority points out, the fourth *Gore* factor, the quality of the photograph, "clearly falls within a range that favors admissibility . . . ." Part II of the majority opinion. This factor alone, however, is insufficient to fulfill the state's obligation of demonstrating that May, as opposed to someone more familiar with the defendant's appearance, was the appropriate witness to identify the defendant.

Last, I find it troubling that May was not a neutral or uninterested witness—he was the victim's brother. As a relative of the victim, he had an interest in ensuring that his brother's killer was arrested and convicted. We have not yet addressed whether the bias of a nonpercipient lay witness factors into the totality of the circumstances analysis under the *Gore* factors, although the Appellate Court has held that "bias concerns the weight to be afforded to a witness' testimony and not its admissibility." (Emphasis omitted.) *State* v. *Orlando F.*, 233 Conn. App. 1, 23,     A.3d     (2025). I need not address the issue in this opinion because, for all of the reasons I have explained, it is clear to me that May lacked the requisite level of familiarity with the defendant, regardless of his relationship with the victim, to aid the jury in its deliberations.

Having considered the totality of the circumstances, I conclude that the trial court abused its discretion in admitting May's identification testimony into evidence for the jury's consideration. Despite the majority's attempt to fit the facts of this case within the *Gore* framework, the plain reality is that the majority's holding represents an enormous expansion of *Gore* far beyond its intended parameters. In a single bound, we have moved from the intimate familiarity gained through a close relationship over many years to a onetime encounter with a stranger lasting less than one hour. I sincerely hope that future cases allow this court to recalculate the proper boundaries of familiarity under *Gore* and to return it to its original meaning. As we observed in *Gore*, the "low standard for general familiarity" that we criticized and declined to adopt in that case "tends to favor the prosecution," and the majority's decision today, unless applied with great caution, will have that unfortunate effect. *State* v. *Gore*, supra, 342 Conn. 158. In the meantime, I urge trial courts to exercise their discretion keeping firmly in mind the principles eluci-

dated in *Gore* and the types of illustrative examples set forth therein. See id., 164 ("[s]ome illustrative examples of persons who may satisfy this standard are friends, longtime acquaintances, neighbors, coworkers, family members, and former classmates").

## II

Although the trial court erred in admitting May's identification of the defendant from the still photograph, I conclude that the evidentiary error was harmless because, on this record, I have "a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Bruny*, supra, 342 Conn. 196. The victim's girlfriend, Cherry Williams, who had known the defendant for a "very long time," since middle school, also identified the defendant as the person depicted in the still photograph. The defendant does not challenge on appeal the propriety of the admission of Williams' identification testimony. Because May's identification of the defendant was cumulative of Williams' testimony, and Williams' identification was the stronger of the two due to her extensive familiarity with the defendant, the erroneous admission of May's identification was unlikely to affect the jury's verdict. See, e.g., *State* v. *Alexander*, 343 Conn. 495, 509–510, 275 A.3d 199 (2022); *State* v. *Tyus*, 342 Conn. 784, 805–807, 272 A.3d 132 (2022); *State* v. *Edwards*, 334 Conn. 688, 713, 224 A.3d 504 (2020).

In addition, cell site location data placed the defendant near the scene of the murder, and the defendant's fingerprints were found in a layer of dust on the victim's vehicle, suggesting that he had touched the victim's vehicle around the time of the murder. Given that it was the activation of the victim's car alarm by someone physically touching the vehicle that lured the victim outside in the early morning hours immediately before the murder, the evidence of the defendant's guilt was

compelling. Last, following May's identification of the defendant, the trial court gave the jury a cautionary instruction, informing it that it was "ultimately . . . your role to decide whether . . . that is the defendant [who] is depicted in that video. You certainly can consider the testimony of . . . May in assessing . . . the reliability of his identification of the person in the video and also [can] use your own powers of observation of the defendant in reviewing the video and the still [photograph] . . . . It's ultimately your decision to decide whether . . . that is, indeed, the defendant." In its final charge, the trial court again explained to the jury that "[i]t is for you to determine whether the person in the [still photograph] is the defendant."[7] These cautionary instructions will not automatically inoculate trial proceedings against the effects of an erroneous evidentiary ruling under *Gore*, but they certainly mitigated the potential for harm under the circumstances of this case. Considering the record as a whole, I am not persuaded that the improper admission of May's identification of the defendant likely impacted the jury's verdict. Because I agree with the majority that the defendant's conviction must be affirmed, I concur in the judgment.

---

[7] The trial court instructed the jury in relevant part: "The state has offered testimony from [May and Williams] that the defendant is the person in the still [photograph] taken from [the] surveillance video. It is for you to determine whether the person in the [photograph] is the defendant. In making that decision . . . the factors [that] you may consider include the following: (1) the witness' general level of familiarity with the defendant's appearance, (2) the witness' familiarity with the defendant's appearance at the time that the surveillance video was taken, (3) any change in the defendant's appearance between the time the surveillance video was taken and trial, and (4) the quality of the video or photographs, as well as the extent to which the subject is depicted in the surveillance footage. You should consider the totality of the circumstances in determining whether [May and Williams] have made an accurate identification of the defendant in the surveillance video or photographs."